IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

MARY MCDONALD,                          )
                                        )
                    Plaintiff,          )
                                        )
          v.                            )   Case No. 05-5002-CV-SW-REL-SSA
                                        )
JO ANNE BARNHART,                       )
Commissioner of Social Security,        )
                                        )
                    Defendant.          )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Mary McDonald seeks review of the final decision of the

Commissioner of Social Security denying plaintiff's application for a period of

disability and disability insurance benefits under Title XVI of the Social Security

Act ("the Act").  Plaintiff argues that the ALJ erred in failing to give controlling

weight to plaintiff's treating physician, Jeffrey Green, D.O., and consulting

psychologist Robert Whitten, Ph.D., and the ALJ erred in discrediting plaintiff's

subjective complaints.  I find that the substantial evidence in the record supports

the ALJ's decision to discredit Dr. Green, Dr. Whitten, and plaintiff.  Therefore,

plaintiff's motion for summary judgment will be denied and the decision of the

Commissioner will be affirmed.

## I.     BACKGROUND

On August 1, 2003, plaintiff applied for a period of disability and disability

insurance benefits alleging that she had been disabled since May 28, 1992.

Plaintiff's disability stems from epilepsy, back problems, osteoporosis,

degenerative disc disease, and hepatitis C.  Plaintiff's application was denied on September 25, 2003.  On August 12, 2004, a hearing was held before an Administrative Law Judge.  On October 20, 2004 the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On December 29, 2004, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange

2

Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.  *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?
                Yes = not disabled.
                No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

                No = not disabled.
                Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

                Yes = disabled.
                No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

                No = not disabled.
                Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

                Yes = disabled.
                No = not disabled.

4

## IV.     THE RECORD

The record consists of the testimony of plaintiff and vocational expert Lisa

Keen, in addition to documentary evidence admitted at the hearing.

## A.     ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

Plaintiff earned the following income from 1974 through 2004:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1974 | $   927.92 | 1990 | $     30.42 |
| 1975 | 85.02 | 1991 | 0.00 |
| 1976 | 394.90 | 1992 | 0.00 |
| 1977 | 401.20 | 1993 | 0.00 |
| 1978 | 1,021.38 | 1994 | 0.00 |
| 1979 | 102.66 | 1995 | 0.00 |
| 1980 | 142.96 | 1996 | 0.00 |
| 1981 | 814.25 | 1997 | 0.00 |
| 1982 | 765.66 | 1998 | 0.00 |
| 1983 | 50.84 | 1999 | 0.00 |
| 1984 | 63.85 | 2000 | 0.00 |
| 1985 | 405.59 | 2001 | 0.00 |
| 1986 | 0.00 | 2002 | 0.00 |
| 1987 | 0.00 | 2003 | 289.23 |
| 1988 | 0.00 | 2004 | 0.00 |
| 1989 | 14.20 | | |

5

(Tr. at 43-44).

**Disability Report - Field Office**

On August 1, 2003, Carol Maddy from Disability Determinations met face-to-face with plaintiff (Tr. at 53-55).  Ms. Maddy observed that plaintiff had no difficulty with understanding, coherency, concentrating, talking, answering, sitting, standing, walking, using her hands, or writing (Tr. at 54).  Ms. Maddy noted that plaintiff was very cooperative, but that she was "very nervous and somewhat paranoid.  Just released from prison for 3rd DWI.  Grooming and appearance appropriate." (Tr. at 54).

**Report of Contact**

On September 15, 2003, L. Bobbitt, a senior counselor with Disability Determinations, completed a Report of Contact (Tr. at 60).  The report states that plaintiff returned a call to Disability Determinations and stated that her last seizure was before she was released from prison, probably May 2003 (Tr. at 60).  Plaintiff was on Dilantin and "has done fine with that since her release."

The form also states as follows:  "Claimant indicates she saw Dr. Rice last week due to bleeding.[1]  He felt she over did it moving and pulled some stitches.  She needs to take it easier and the spotting should stop.

"Re: anxiety - she never has had appointment at Ozark Center.  She thinks the anxiety has been from adjustment to normal living from after

_____

[1]Dr. Rice performed a hysterectomy on plaintiff on August 19, 2003.

incarceration. She does take Prozac. She can do her ADL's [activities of daily living] without problems, she interacts with others without difficulty! She doesn't feel like she has limitations due to the anxiety." (Tr. at 60).

**B.    SUMMARY OF MEDICAL RECORDS**

Plaintiff's medical records date back to July 22, 2002, when she was in the custody of the Department of Corrections. All of the records summarized below are from the Department of Corrections until July 24, 2003, when plaintiff went to Freeman Health System shortly after she was released from custody.

On July 22, 2002, plaintiff saw Alice Clay, a technician (Tr. at 83). "She would like to have counseling. She said she has cut her wrists, OD'd, two suicide attempts in the past. . . . Denies she is suicidal at this time." Plaintiff was referred to the psychiatrist for evaluation.

On July 29, 2002, plaintiff saw Dr. Patricia Barbee (Tr. at 204). Plaintiff reported history of seizures with her last seizure one week ago. She also reported a history of hypertension and was on medication for that. Plaintiff requested that she be prescribed Premarin [hormone replacement] and FemHRT [hormone replacement]. The doctor said she would send for plaintiff's medical records, and plaintiff said, "Oh you will not find my records the doctor moved." The doctor noted that in the past plaintiff had listed Premarin as an allergy.

On August 5, 2002, plaintiff had lab work done (Tr. at 192). AST and ALT (liver enzymes) were both slightly high. AST was 41 (normal is 0-40), and ALT

7

was 51 (normal is 0-40).

On August 7, 2002, plaintiff saw Ms. Clay (Tr. at 83).  Ms. Clay noted that plaintiff's brother was taken off life support yesterday, and plaintiff had grief issues.

On August 13, 2002, plaintiff saw Dr. Agara Reddy (Tr. at 82).  Plaintiff reported feeling sad, depressed, poor sleep, headache and back pain.  "Reports of taking Xanax [used to treat anxiety], Doxepin [anti-depressant] in the past. Denies previous suicide attempts or psychiatric hospitalization treatment. Reports of alcohol abuse."  Plaintiff's mood was mildly depressed, her affect anxious and tearful.  Dr. Reddy assessed "rule out depressive disorder not otherwise specified, history of alcohol abuse."  Plaintiff was started on Doxepin.

On August 13, 2002, plaintiff saw Nurse Marsha Kerns (Tr. at 185, 188). Plaintiff complained of her back hurting, she said her discomfort increases with movement or position change.  When asked if she had any previous history of back pain, she said, "had back broke".  Range of motion was within acceptable limits.

On August 21, 2002, plaintiff saw Nurse Tricia Fischer (Tr. at 183). Plaintiff said she was diagnosed with seizures at age five and diagnosed with hypertension in 2000.  "Is being treated at this time with Dilantin [used to control seizures] . . . .  She complained of feeling disoriented taking this medication and has been refusing some doses.  She is being treated with Maxzide [diuretic] and

Atenolol [a beta blocker used to lower blood pressure] for her blood pressure. Today she was changed from Dilantin to Tegretol [used to control seizures].

On August 21, 2002, plaintiff saw Dr. Gregory Rakestraw (Tr. at 200-202). "The patient has had epilepsy since she was a baby. On the outside she was on Dilantin (name brand) as well as Xanax. She has been off the Xanax now for 6 months she says." Dr. Rakestraw prescribed Carbamazepine [treats seizures] and Phenytoin [used to control seizures].

Later that same day, plaintiff saw Dr. Rakestraw again (Tr. at 198-199). He assessed hypertension, prescribed Atenolol [a beta blocker used to lower blood pressure] and Triamterene [diuretic]. He recommended diet, exercise, salt restriction, weight loss, education on failure of life-style modifications, and enroll in non-smoking program.

On August 27, 2002, plaintiff saw Dr. Reddy (Tr. at 82). Patient says, "I am doing OK. . . . Denies any problems with meds. Mood and affect improving." Assessed depressive disorder, continued plaintiff on Doxepin.

On August 29, 2002, plaintiff saw Nurse Marilyn Meyer (Tr. at 179). Ms. Meyer wrote, including statements by plaintiff, the following: "I had a seizure and the officers told me to write it up because the nurses would not see me. My right shoulder is still killing me. My back hurts bad and have a hard time getting in and out of the bed. Dilantin has been stopped. No hives at this time. No blisters at this time. But I have sores between my fingers from the medicine." Plaintiff also

9

complained of swelling in her ankles and legs. No deformity was noted of either shoulder, no edema was noted in either leg. Did note tightened muscles in plaintiff's back at the shoulder area.

On September 18, 2002, plaintiff saw Dr. Rakestraw (Tr. at 2002). He assessed seizures and right shoulder contusion. He prescribed Ibuprofen 800 mg (200 mg is over-the-counter strength) for shoulder pain, Triamterene [diuretic], Atenolol [a beta blocker used to lower blood pressure], and Carbamazepine [treats seizures].

On September 23, 2002, plaintiff had x-rays taken of her right shoulder, three views (Tr. at 176). Impression: normal radiographic study.

On October 8, 2002, plaintiff saw Technician Debra Davenport who noted that plaintiff refused her lab test stating, "I stopped taking Tegretol five days ago." (Tr. at 173).

Later that same day, plaintiff saw Nurse Patricia Casady (Tr. at 81). "Reports she has been feeling terrible and would like to be seen ASAP. Reports she has been having seizures and does not feel like seizure med is working for her."

On October 10, 2002, plaintiff saw Nurse Marilyn Meyer (Tr. at 171-172). Plaintiff stated she was experiencing heavy vaginal bleeding and she had a seizure the night before, which was not witnessed by medical. Plaintiff refused her Tegretol [used to control seizures], refused her Dilantin [used to control

seizures].  No seizure activity was noted, plaintiff had a sanitary pad on with no bleeding noted after 45 minutes.

On October 11, 2002, plaintiff saw Dr. Barbee (Tr. at 174).  Plaintiff complained of a two-week history of continuous bleeding.  Dr. Barbee started plaintiff on Esterified Estrogens [used to treat symptoms of menopause], Medroxyprogesterone [treats irregular or abnormal uterine bleeding], and Metronidazole [an antibiotic].

On October 17, 2002, plaintiff saw Dr. Ahmed Taranissi (Tr. at 80).  "Has 23 year old son, 28 year old daughter, she used to be on SSI for GM [grant mal] seizure, charge:  DWI x 3 [driving while intoxicated, third conviction].  In 93 she has lost 2 family members due to AIDS complications.  In 96 her mother passed away as a result of a heart attack.  She became increasingly depressed and received treatment:  Xanax [used to treat anxiety], Doxepin [anti-depressant].  Today her mood is depressed. . . .  According to her she has large amount of vaginal bleeding. She feels drained when she lost her mother she [overdosed] on 100 tablets of Valium and she had treatment in the ICU.  Her concentration is decreased.  She said that she stopped her Tegretol [used to control seizures] as a result of developing a rash. . . .  She feels that the Doxepin is not helping at this point, she denies any side effects due to the meds."  Assessment:  Major

11

depressive disorder, recurrent; Dysthymic disorder[2]; Rule out bipolar disorder Type 1[3]; Vaginal bleeding. Discontinued Doxepin, started Vistaril [used to treat anxiety].

On October 28, 2002, plaintiff did not show up for group therapy (Tr. at 80).

On November 13, 2002, plaintiff saw Nurse Rebecca Hurd (Tr. at 164). Plaintiff complained of pain in her back and shoulder, she was taking Motrin but it was not helping. Nurse Hurd observed no swelling in plaintiff's back or shoulder area, plaintiff had full range of motion. Nurse Tricia Fischer noted that plaintiff refused all doses of her Tegretol [used to control seizures].

On November 18, 2002, plaintiff saw Nurse Barbara Wilson (Tr. at 162). Plaintiff complained of left arm pain and numbness. She had good range of motion in her left shoulder. Nurse Wilson instructed plaintiff to put hot packs on her shoulder.

---

[2]Dysthymic Disorder is characterized by chronic depression, but with less severity than a major depression. The essential symptom for dysthymic disorder is an almost daily depressed mood for at least two years, but without the necessary criteria for a major depression. Low energy, sleep or appetite disturbances and low self-esteem are usually part of the clinical picture as well.

[3]Bipolar Disorder Type I. Bipolar disorder type I is characterized by at least one manic episode, with or without major depression. With mania, either euphoria or irritability may mark the phase, and there are significant negative effects (such as sexual recklessness, excessive impulse shopping, sudden traveling) on a patient's social life, work, or both. Untreated mania lasts at least a week or results in hospitalization. Typically, depressive episodes tend to last six to 12 months if untreated. However, untreated manic episodes last three to six months.

On November 19, 2002, plaintiff saw Nurse Barbara Zastrow and Nurse Rebecca Hurd (Tr. at 157-160, 162). Plaintiff complained of chest pain beginning the day before. Pain was described as a 10 out of 10. "States that she is getting a lawyer." Observed plaintiff's skin was warm and dry, plaintiff was moving about, grabbing at her left arm, said her arm hurts and she thinks she is having a heart attack or a stroke. Her grips were equal, had good capillary return, her speech was clear, she was alert and oriented to time, place and situation. Plaintiff complained of chronic back pain and said she is out of Motrin. Noted that plaintiff is a smoker. Full range of motion in arm without assistance. EKG was normal. Consulted with Dr. San-Gil. Received permission to give plaintiff a single Motrin; however, she left the medical unit before she received the Motrin.

On November 20, 2002, plaintiff saw Dr. Benito San-Gil (Tr. at 155). Plaintiff had made repeated complaints to nurses about chest pain and left shoulder pain. "She is adamant about her claims of illness. Objective measures do not validate her catastrophic claims of heart attack and stroke; she also argues about having an x-ray of her left shoulder, 'the other doctor did it and my right shoulder was broke' when her normal x-ray was reviewed with her she insists that there is something wrong with her because she is having pain." Dr. San-Gil noted that plaintiff left the medical unit the night before prior to getting her Ibuprofen as prescribed. She said "Those don't do nothing for me." Dr. San-Gil assessed dependent/anxious personality disorder, musculoskeletal pain,

13

hypertension.  He continued her Atenolol [a beta blocker used to lower blood pressure], told her to decrease her salt intake, increase her water intake, advised her to exercise and she said she was already doing that.  Daily aspirin was started and plaintiff was informed that was to help her circulation, not necessarily for her pain.

On November 21, 2002, plaintiff had three x-rays of her left shoulder (Tr. at 155-157).  Impression:  Normal radiographic study.

On November 25, 2002, plaintiff signed a refusal, did not want to attend group therapy (Tr. at 79).  That same day plaintiff saw Nurse Wendy Hull (Tr. at 153).  Plaintiff complained she could not use her arm due to pain.

On November 26, 2002, plaintiff saw Nurse Marsha Kerns (Tr. at 153-154).  Plaintiff had no mental health complaints; no existing medical or mental health conditions; no crying; no signs of being withdrawn, hostile, or angry.  Plaintiff denied any complaints.

On December 7, 2002, plaintiff saw Nurse Patricia Crisman (Tr. at 151, 154).  Plaintiff had complaints of pain radiating down her left arm, had been going on for a week.  X-rays were normal, order was still current for prescription Ibuprofen, 800 mg.

On December 9, 2002, plaintiff saw Dr. Henry Taylor (Tr. at 165-166).  Plaintiff reported a history of seizure disorder since childhood but "presented as a very conflicting history - states she was taken off the Dilantin due to inability to

14

get adequate blood level while on the generic form but lab shows level of 10.7 & Dr. R's note states 'she can't tolerate the Dilantin', which she presently steadfastly denies. States she took herself off the Carbamazepine [treats seizures] due to skin rash and itch. States she has had 3 grand mal seizures since arrival here." Dr. Taylor assessed seizure disorder, conflicting history of meds. Prescribed Phenytoin [used to control seizures] and resumed Dilantin [used to control seizures].

On December 12, 2002, plaintiff saw Nurse Leslie Lake (Tr. at 152). Plaintiff presented to medical complaining of hives and itching, said the doctor just started her back on Dilantin and she feels she is having a reaction because she cannot tolerate the generic form of this drug.

That same day, plaintiff saw Dr. David Cochran (Tr. at 161). Plaintiff complained of left arm and chest pain for the past three weeks. Dr. Cochran assessed back pain and prescribed Ibuprofen 600 mg (over-the-counter dose is 200 mg).

On December 15, 2002, plaintiff saw Dr. Taranissi (Tr. at 78-79). "She has been feeling anxious, snappy, her sleep pattern is disturbed. She has muscle tension. She has stopped her Vistaril [used to treat anxiety] for at least 2 weeks, she felt that it made her restless. She stated that her brother was killed in a motor vehicle accident." Dr. Taranissi assessed major depressive disorder, recurrent; Dysthymic disorder; Rule out bipolar disorder I. Discontinued Vistaril

15

per patient request, started Elavil [anti-depressant].

On December 19, 2002, plaintiff saw Dr. David Cochran (Tr. at 149). No change since previous visit, still drops things occasionally, left hand grip strength is 4/5. Assessed chronic muscle pain in left shoulder, recommended using ice for 20 minutes, three times a day for 10 days.

On January 3, 2003, plaintiff saw Dr. Sripatt Kulkanthorn for complaints of shoulder pain (Tr. at 150). Dr. Kulkanthorn assessed supraspinatus tendinitis[4] and prescribed Naproxen [non-steroidal anti-inflammatory] 500 mg.

That same day plaintiff saw Edwina Morriss-Hirner, a technician (Tr. at 78). This was plaintiff's initial session with Ms. Morriss-Hirner. "She is not happy with her prescribed medication. There are several side effects: dry mouth, lethargy after lunch, more irritable mood, weight gain of 15 pounds. . . . Ms. McDonald does appear irritable; but her mood/affect are within normal limits." Assessed major depressive disorder, recurrent; dysthymic disorder; rule out bi-polar disorder. Plain: refer to psychiatrist for medication check.

On January 6, 2003, plaintiff saw nurse Marsha Kerns (Tr. at 140). Ms. Kerns observed plaintiff on the floor, said she is not having a seizure but she feels dizzy and cannot walk. All vital signs were within normal limits. Told plaintiff to put in a sick call if she did not feel better by morning. Later in the day,

---

[4]Also known as rotator cuff tendinitis - an inflammation (irritation and swelling) of the tendons of the shoulder.

16

plaintiff reported she had a seizure that morning and wants her medication back.

On January 11, 2003, plaintiff saw Nurse Debra Davenport (Tr. at 136). Plaintiff complained of left arm irritation for the past hour, Dr. Hampton recommended 50 mg Benadryl [an antihistamine] three times per day for 24 hours.

On January 13, 2003, plaintiff saw Nurse Patricia Casady (Tr. at 77, 137-138). "'My medicine is not right. I can't take the Elavil.' Reports Elavil caused her to have a seizure on 1-11-03. States she has not taken the Elavil the last four days. 'My hands swelled up so badly I couldn't write. I've been broke out in a rash. . . . I can't take generic Dilantin. I do just fine on the brand Dilantin. My blood pressure medication is not right." Ms. Casady assessed anxiety related to perceived loss of control regarding treatment. Saw Dr. Sripatt Kulkanthorn whose medical records state that someone observed plaintiff's seizure. He prescribed Atenolol [a beta blocker used to lower blood pressure], Carbamazepine [treats seizures], and Diphenhydramine [same thing as Benadryl, an antihistamine].

On January 16, 2003, plaintiff saw Edwina Morriss-Hirner, a technician (Tr. at 77). "She is still suffering from side effects as a result of medication. I noticed that her hands were swollen and inflamed as though they were severely chapped. She can't move her fingers easily. . . . Her mood was stable." Ms. Morriss-Hirner agreed to talk to the nurse about plaintiff's side effects.

17

On February 4, 2003, plaintiff saw Dr. Tomas Cabrera (Tr. at 133). Dr. Cabrera assessed hypertension based on two subsequent visits of elevated blood pressure, recommended diet, exercise, and salt restriction.

On February 6, 2003, plaintiff's Hepatic Function panel [blood test to determine liver function] was normal (Tr. at 124).

On February 7, 2003, plaintiff saw Jim McVeigh, a technician (Tr. at 76). "Offender was seen today for routine mental health follow up. Not satisfied with Elavil [antidepressant] - 'Throws me into seizures' . . . Mentioned menopause as another factor in her current emotional state. Asked that Vistaril [used to treat anxiety] be discontinued due to 'bad hangover' and swelling." Assessed major depression, recurrent.

On February 15, 2003, plaintiff saw Dr. Taranissi (Tr. at 75). Plaintiff complained of being more emotional, crying at times. She feels down during groups. She is not on any psychiatric medications at this point. Assessed major depressive disorder, recurrent; Dysthymic disorder; Rule out bipolar disorder. Started Prozac[5], Fluoxetine[6], Doxepin [antidepressant].

On February 18, 2003, plaintiff saw Nurse Sara White (Tr. at 130-132, 135). No seizure activity since last visit, asked about side effects of medication: no drowsiness, no easy bruising, no skin discoloration, no oral sores, no fatigue,

_____

[5]A selective serotonin reuptake inhibitor used to treat depression.

[6]A selective serotonin reuptake inhibitor used to treat depression.

no dizziness, no confusion. Observed ankle swelling, no anxiety or restlessness. Educated plaintiff on diet, weight control, restricted sodium, low fat, exercise, and smoking cessation.

On March 18, 2003, plaintiff saw Brenda St. Clair, a technician (Tr. at 121). Plaintiff signed a refusal. She was given generic medication and stated she cannot take it. She has been waiting for non-generic and has not received it yet.

On March 31, 2003, plaintiff saw Nurse Marilyn Meyer (Tr. at 116). Plaintiff complained that her back and neck hurt. "I thought I was going home but waiting on Jeff City." Plaintiff was on Ibuprofen and Naproxen at the same time, she noted tight muscle greater in the left side of the neck than the right. Ms. Meyer encouraged relaxation, gave plaintiff Tylenol and referred her to the doctor.

On April 2, 2003, plaintiff saw Nurse Wendy Hull at 10:30 a.m. (Tr. at 116). Plaintiff said she had a seizure, said she fell and hit her head. Upon arrival, plaintiff was lying prone unresponsive to voice. She did follow commands. No hematoma was noted on plaintiff's head. She had an abrasion on her left arm but no bleeding. Was sent to the medical unit.

That same day at 6:30 p.m., Nurse Barbara Wilson observed plaintiff (Tr. at 114, 117). Plaintiff had been resting in the medical unit since morning. "When arrived at education offender was lying on floor was awake and alert x three, skin

warm and dry. Stated I got hot and passed out, I didn't have a seizure. States I'm so tired that is why this is happening."

Again that same day at 8:45 p.m., Nurse Barbara Wilson observed plaintiff (Tr. at 114). "Offender lying on floor in officers bubble at one house when medical arrived. Was awake and alert. Sat up to sitting position. Oxygen saturation 99%, skin warm and dry. When asked if she had a seizure she stated yes. No postictal activity [following a seizure].

On April 3, 2003, Nurse Catherine Griffith observed plaintiff (Tr. at 112-113). "N. Meyers R.N. states that the patient was on the floor in the x-ray where they say that she had a seizure, nurse reports that the patient was not postictal [following a seizure], patient knew who the nurse was, patient was alert and oriented x3 at this time. Orders received per Dr. Kul to give 5 mg Valium IV[7]." Also ordered Dilantin [used to control seizures]. The nurse was unable to get the IV started because plaintiff was in her room eating lunch. The doctor then told her to hold the Valium, give the Dilantin as directed. Plaintiff was located in the day room later, no complaints, no seizure activity noted, she was up and walking in the hallway.

On April 16, 2003, plaintiff saw Nurse Patricia Casady (Tr. at 74-75). "I'm so upset. I don't know why I'm here." Plaintiff stated that her date was taken from her, she thought she was going home on March 26, 2003. "They keep

_____

[7]Valium given intravenously to stop a seizure.

giving my family different times to come pick me up."  Nurse Casady assessed

anxiety related to not knowing her release date.  The nurse paged Dr. Taranissi

who ordered an increase in Doxepin [antidepressant].

On April 28, 2003, plaintiff saw Dr. Taranissi (Tr. at 74).  Plaintiff reported

she had been more anxious, was stressed about being in population, felt like she

was not adapting well, reported occasional hopelessness.  "She feels that her

Doxepin helps her calm down.  Prozac [treats depression] helps her stabilize her

mood."  Diagnosed major depressive disorder, recurrent; Dysthymic disorder;

Rule out bipolar disorder.  Refilled Doxepin, increased Prozac, started Tegretol

[used to control seizures].

On May 1, 2003, plaintiff saw Nurse Catherine Griffith (Tr. at 109).

Plaintiff complained of pain in her neck and shoulders.  Plaintiff reported that

when she had pain in her back she was given Motrin.  Nurse Griffith observed no

swelling in plaintiff's neck, shoulder, or back area.  Referred to doctor for pain.

On May 5, 2003, plaintiff saw Jim McVeigh, a technician, for a routine

mental health follow up  (Tr. at 73).    "Angry at loss of release date (March 26,

'03) but might leave on July 11, '03.  Not satisfied with effects of previously

prescribed Elavil and Trazodone [antidepressant]."  Assessed Major Depression,

recurrent (provisional diagnosis), and rule out bipolar disorder.

On May 6, 2003, plaintiff saw Nurse Leslie Lake (Tr. at 109). Plaintiff complained of a rash on her arms and legs, thought it was related to her Prozac, said she had not taken her medication for the past two days because of the rash. Referred to doctor, gave hydrocortisone cream.

On May 12, 2003, plaintiff saw Nurse Rebecca Hurd (Tr. at 102). Plaintiff went to the medicine window asking for Motrin. She had been given a card of 30 on May 6, 2003, she was directed to take one three times a day as needed for pain, "so she has been taking too much." Nurse informed the doctor and was told to make it a DOT [dispensed only at the medicine window] for a month "so we can see how she is using it." Nurse Tricia Fischer sent a letter to the housing unit stating that plaintiff needs to take her Motrin at the medicine window for 30 days because of report of misuse per Dr. Cabrera (Tr. at 87).

On June 2, 2003, plaintiff saw Dr. Cabrera (Tr. at 96, 99). Plaintiff complained of pain in her lumbar-sacral area. Her gait was normal, muscle strength normal, tendon reflex normal, perianal sensation normal, posture normal, range of motion normal, no muscle spasms, no point tenderness in her spine, straight leg raising was normal. He assessed low back strain and prescribed exercises using an extension or flexion program, told her to quit smoking, prescribed acetaminophen (Tylenol) up to 4 grams per day.

On June 24, 2003, plaintiff saw Dr. Taranissi (Tr. at 73). "Worried about going outside and the possibility of relapse. Ms. McDonald felt that she needs a

22

lower dose of Prozac because she has felt weird. She has been working in the HU [housing unit]. . . . Sleep is fine, appetite is fine. She has occasional hopelessness. . . . She felt that Prozac and Doxepin helped her depression." Assessed major depressive disorder, recurrent; rule out bipolar disorder. Dr. Taranissi decreased plaintiff's Doxepin and Prozac, noted that Tegretol had already been discontinued because of rash. Recommended individual and group therapy.

On June 30, 2003, plaintiff saw Jim McVeigh, a technician (Tr. at 72). "Seen on this date for planning of mental health follow-up in the community. Is scheduled for release from confinement via parole on July 11. Ms. McDonald indicated that she is doing well with her recent psych med reduction of doses. Plans to seek mental health follow-up at Ozark Mental Health in Joplin. Realizes need to remain clean from illicit substances or prescription medications such as Xanax." Assessed major depression, recurrent.

On July 10, 2003, plaintiff saw Nurse Leslie Lake (Tr. at 86). Plaintiff on meds, no complaints voiced at this time. Plaintiff was released from prison the following day, July 11, 2003. During the previous year while plaintiff was incarcerated, she was seen by medical personnel at the prison and was noted to have no medical/mental health complaints, no crying, not withdrawn, not hostile or angry, not manic, and denied complaint on all of the following days: August 7, 2002 (Tr. at 190); August 8, 2002 (Tr. at 145-146), August 11, 2002 (Tr. at 145),

August 14, 2002 (Tr. at 145), August 15, 2002 (Tr. at 145), November 26, 2002 (Tr. at 144), November 26, 2002 (Tr. at 153-154), November 27, 2002 (Tr. at 143-144), November 28, 2002 (Tr. at 143), November 29, 2002 (Tr. at 143), November 30, 2002 (Tr. at 143), December 2, 2002 (Tr. at 142-143), December 3, 2002 (Tr. at 142), December 4, 2002 (Tr. at 142), April 3, 2003 (Tr. at 105, 112, 142), April 4, 2003 (Tr. at 105), April 7, 2003 (Tr. at 105), April 8, 2003 (Tr. at 104-105), April 9, 2003 (Tr. at 104), April 11, 2003 (Tr. at 104), April 13, 2003 (Tr. at 104), April 14, 2003 (Tr. at 104, 107), April 15, 2003 (Tr. at 167), April 16, 2003 (Tr. at 107), April 17, 2003 (Tr. at 107), April 18, 2003 (Tr. at 106-107), April 19, 2003 (Tr. at 106), April 20, 2003 (Tr. at 106), April 22, 2003 (Tr. at 106), April 23, 2003 (Tr. at 87, 106), April 24, 2003 (Tr. at 87).

In addition, she was a no show for either treatment or counseling on August 15, 2002 (Tr. at 185); August 16, 2002 (Tr. at 186); October 28, 2002 (Tr. at 80); and March 24, 2003 (Tr. at 118).

On July 24, 2003, Paul Jones, M.D., a radiologist at Freeman Health System, took two views of plaintiff's chest. Impression: no sign of acute pulmonary disease (Tr. at 224, 243, 299, 354).

On July 29, 2003, Dr. Jones performed a Transvaginal pelvic ultrasound due to dysfunctional uterine bleeding (Tr. at 225, 242, 297, 340). His impression was:

1.      3 cm simple appearing ovarian cyst with no direct evidence of a adnexal mass or significant free pelvic fluid.

2.      Probable 1 cm fibroid within the left posterior body of the uterus. The endometrial stripe measures 5 mm with no other focal uterine abnormality being detected.

3.      Status post right oophorectomy [removal of an ovary] reportedly secondary to cyst formation.

On August 1, 2003, plaintiff filed her application for disability benefits.

On August 5, 2003, plaintiff saw Lee Roy Rice, M.D. (Tr. at 240). "She has had a tubal ligation. The patient has been having heavy vaginal bleeding for the last year. She bleeds about 3 weeks out of each month. She was in state prison for a DWI for the last year; she just got out in mid-July. They put her on Premarin and Provera, but she would continue to bleed through that medication. . . . The patient had her right ovary removed in 1996 for a cyst. She was seen in the emergency room on 7/24/03, because of her bleeding and she was having pelvic pain." Examination: extremities have a good range of motion with no edema noted. "We discussed various treatments such as hormone replacement, which she has tried and failed, D&C, or a hysterectomy. The patient wants definitive treatment and wants to have a hysterectomy as soon as possible."

On August 7, 2003, plaintiff saw Jeffrey Green, D.O., to establish care and get refills on her medications (Tr. at 286-291, 345). The records indicate that she

was smoking a pack of cigarettes daily. Dr. Green assessed hypertension (prescribed Lisinopril), epilepsy, and arthritis in the low back (gave Vioxx samples).

On August 19, 2003, Dr. Margaret Janssen and Dr. Rice performed a hysterectomy at Freeman Hospital (Tr. at 215-218, 236, 239). Social history: "The patient does smoke. She has had a history of ethanol abuse [alcohol abuse] in the past." No swelling in her extremities, good range of motion. Was discharged on August 20, 2003. "I did discuss smoking with the patient, smoking is a deterrent to wound healing and also the other obvious risks of smoking with lung cancer and pulmonary diseases and encouraged her to stop. . . . Her condition is good and prognosis is good."

On August 28, 2003, plaintiff called Dr. Rice's office and stated that she had been climbing stairs and was experiencing vaginal bleeding (Tr. at 234). She was instructed to stop climbing stairs and decrease her activities.

On September 4, 2003, plaintiff saw Dr. Green for a follow up on constant, dull back pain (Tr. at 285, 339). Dr. Green assessed low back pain, prescribed Lodine [non-steroidal anti-inflammatory], recommended the use of ice and physical therapy. He also diagnosed hypertension and instructed plaintiff to continue on her medication.

On September 9, 2003, plaintiff saw Dr. Rice for a three-week checkup following her hysterectomy (Tr. at 233). She was cleaning on some cabinets and

26

fell off the stool onto her left side." Impression: satisfactory post-op exam. Recommended she continue with Cenestin [estrogen].

On September 16, 2003, plaintiff was seen at the Ozark Medical Center (Tr. at 311). Long history of excessive anxiety/high strung. Reported alcohol use for 20 years and cocaine use with last use two years earlier. Diagnosed major depressive disorder, anxiety, alcohol/cocaine dependence, seizure disorder, hypertension, degenerative disc disease, GAF 60[8], previous year 80[9]. Remainder of record is illegible.

On September 23, 2003, Robert E. Whitten, Ph.D., prepared an "assessment of conditions that might make [plaintiff] eligible for Medicaid and General Relief" after plaintiff was referred by Mike Kelly of the Division of Family Services (Tr. at 313-317). Portions of the report are as follows:

> Mary told me that she had been receiving Social Security disability benefits for about fifteen years since 1988 based on a history from childhood of epilepsy prior to going to prison in 2002. . . . At fourteen possibly following a serious accident in which she was thrown from a pickup truck and knocked unconscious, grand mal seizures began and have continued with variable frequency up to the present time. She reports a series of car accidents which have knocked her unconscious over her life-time and she has been repeatedly knocked unconscious by

---

[8]A Global Assessment of Functioning ("GAF") of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-worker).

[9]A GAF of 80 means that if symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork).

27

several of her husbands, one of whom hit her in the head with metal pipes and even a log. She indicated that heavy use of alcohol which she has engaged in from time to time would greatly increase the frequency of her seizures and she had eighty in the year prior to going to prison following obtaining two DUI's in three weeks in 2002. She told me today she had been drinking heavily for six or seven months following collapse of her relationship with her last husband. She was just released in July and is feeling a great deal of pressure and impatience in adjusting to being out and being forced to deal with hormonal and body changes induced by a needed hysterectomy she obtained with considerable reluctance on the part of her surgeon in August. When her life has been more stable such as during prison or when under the care of a local psychiatrist she had seen for several years, seizure rate has been between ten and twenty a year. She regards herself as an anxious person who has long overworried and been tense. She has been treated also for symptoms of Panic and Agoraphobia around crowds which she avoids going around in places like Walmart or shopping malls. Her mood has often been depressed and is now so consistently though she was placed on anti-depression medications in prison and continues to take one as she adjusts.

Mary has had very limited education and was given special remedial reading assistance during the eight years she was in school prior to marrying for the first time and having her first child at fourteen. Tests of verbal ability show just borderline mental retardation level skills and other testing shows that she is impaired in verbal memory and working memory and concentration. . . . She feels she has had two small strokes which affected her face on the right side for a few days and her left side which produced more lasting loss of coordination on the left and some awkwardness in use of her left arm and hand. The last occurred during her recent stay in prison . . . I observed some impairment of verbal expressive language functioning on the WAIS-III [Wechsler Adult Intelligence Scale - Third Edition] with awkwardness of definitions and offering tangential associations without being able to come to a point at times effectively. She has re-applied for disability benefits and anticipates that they will be soon forthcoming.

Treatment History:
Mary told me that she drank heavily prior to separation from her last husband some months prior to going to prison for DUI's. She took months of substance abuse programming for this in prison. During an interval from her early twenties until she was thirty, she drank heavily and was in substance abuse treatment and detoxification on three different occasions

28

at the Ozark Center locally. . . . She continues to take Prozac but is concerned that it is behind her increasingly agitated and impatient feelings. . . . She has had one visit recently with an Ozark Center psychiatrist who has prescribed the Prozac and wants even to increase the dose along with Remeron also for depression which she has not filled. She said she did not like to have to take any pills. . . .

Clinical Observations:
Mary missed her first appointment because her arrangements with her daughter to provide a ride through a friend did not materialize. She was prompt today but had to leave before I had finished all testing I might have given to explore her memory and neurological status and learning ability. This was because the man who brought her had an appointment that required her to leave then. Mary sounds calm when spoken to about the re-schedule over the phone and seems poised and verbally capable in conversation during most of the session prior to onset of test demands which she clearly is unable to handle with stability. Her conversational ability had led me to expect her to possess average verbal skills, seemingly higher than obtained verbal and verbal memory scores obtained on actual testing. When she does not then have to come to a specified point as in WAIS-III verbal comprehension questions or vocabulary definitions, nothing abnormal is spotted in verbal expression form or pace. Her effort on WAIS-III testing became significantly diminished as her level of impatience and frustration grew, so that the actual test scores likely do underestimate her potential on some types of tasks. . . .

Test Appraisal:
On the logical memory paragraphs from WMS-III [Wechsler Memory Scale - Third Edition] Mary is at a scale score of 4, mild retardation level on immediate recall and at a scale score of 6, borderline, on about twenty-five minute delay. Her memory then for once heard organized verbal information is quite impaired immediately but she does not stay as poor on delay moving to a relatively better but still quite impaired borderline MR level on delay.

Here are her scores on the verbal section of WAIS-III for her age group of forty-five:

Verbal I.Q.   72        Verbal Comprehension Index  74

. . . As indicated, these scores are both in the Borderline Intellectual Functioning range but may be somewhat lower than her potential given her limited years of education and reading history and due to loss of motivation and impatience with handling even mild levels of challenge to her ability. She began to feel clearly inadequate and responded by lashing out and complaining. Her memory for orally stored ordered number series was average when recited as heard, but dropped to highly impaired levels when she had to reverse the digits getting only three backwards in order correctly. She had trouble tracking problem facts on arithmetic and then could not concentrate to operate on them, being weakly borderline on that task. Her memory for facts of information is mild MR level. She is more strongly borderline on vocabulary and concept reasoning on similarities. Here her tangential verbal expressions were seen as in stating that "consume" meant "too much" and saying an egg and a seed were alike because they are "hard."

Family History:
. . . She began occasional drinking at seventeen long after leaving school and having married the first husband and having her first of two children. The first husband was physically abusive to her and they divorced when she was seventeen though she attempted to remarry him along with another husband, two times, each time unsuccessfully fairly quickly. She married a second time to a man she left after one month when he left for overseas with the military. Her third husband married at twenty-three, was severely abusive physically as described above. She married him twice over a ten year period. She has married a fourth man who also was alcoholic and has nearly died recently from alcoholic hepatitis. Though they first married nearly twenty years ago, he always maintained other places to live and she estimated that they were actually together not more than five of those years. Even though in poor health he has been upsetting to her by coming around soon after she got out of prison and asking her for another chance. During a two year interval during her twenties she stopped her heavy drinking and substituted cocaine for about two years. . . .

. . . Memory and concentration have been found to often be poor. She sustains most interests of her past life and can enjoy some activities. Observed Symptoms: Mary seemed mostly poised until testing began when she seemed anxious, irritable, and much more tense than before. Her thinking then becomes somewhat more disorganized and she is impatient and restless. She is unable to sustain focus on concentration or memory demanding tasks then. I anticipate that she could not sustain

work focus with persistence and good output pace on even simple tasks seeing her reaction to the moderate intellectual challenges of testing lasting only thirty to forty minutes.

Dementia due to head traumas:
Given her history of seizures and multiple head injuries and comas as well as likely strokes and heavy substance abuse, it must be assumed that memory and concentration as well as expressive language functioning has been damaged as well as stability of mood control and inhibition of anger.

Panic Disorder with Agoraphobia:
Mary tells me that she had been diagnosed and treated for this condition as well by the private psychiatrist who left town four years or more ago. She continues to experience chest pain, heart acceleration, difficulty breathing, agitation, and fear if she must be around large groups and is still avoiding going into Walmart or malls for this reason.

Summary:
Mary can understand some semi-skilled work procedures and retain them if overlearned. Immediate memory for new instructions or non-routine instructions would be often forgotten and not carried out without constant reminders. Her concentration in my view is inadequate to carry out even simple routine overlearned tasks as she becomes increasingly agitated and tense and angry distracting her and lowering her production and persistence. This in turn has historically sharply elevated the frequency of seizures which have been viewed for years as disabling her. Due to Agoraphobia and anxiety, she cannot relate to large numbers of the public or co-workers. She can relate to a few. She is not very able to adapt to changes at work as change is overwhelming her currently without even attempting to work. She could make simple work related decisions. She is viewed as a reliable informant about her problems. Treatment if ongoing might slightly improve her condition with regard to depression and anxiety. It would not aid multiple neurological systems presumed damaged. She is able to handle her own funds and cash benefits if granted.

Diagnostic Impression:
Axis I: 26.32 Major Depression. 300.02 Generalized Anxiety Disorder. 300.21 Panic Disorder with Agoraphobia. 294.1 Dementia due to head traumas.
Axis II: V62.89 Borderline Intellectual Functioning

Case 3:05-cv-05002-REL   Document 18   Filed 10/11/05   Page 31 of 68

Axis III:  Multiple head traumas.  Strokes said to affect both sides of her body and face.  High blood pressure.
Axis IV:  Economic problems.  Occupational problems.
Axis V:  Current GAF:  45 Serious impairment in cognitive, school, social, emotional, and occupational functioning.

On September 24, 2003, Lester Bland, Psy.D., completed a Psychiatric Review Technique (Tr. at 249-263).  Dr. Bland found that plaintiff suffers from affective disorders, i.e., depression, but that her mental impairment is not severe (Tr. at 249, 252).  He found that plaintiff has no restriction of activities of daily living; no difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and has had no repeated episodes of decompensation (Tr. at 259).

On September 25, 2003, plaintiff's application for disability benefits was denied.

On October 2, 2003, plaintiff saw Dr. Green for a follow up and medication change (Tr. at 284, 338).  Plaintiff stated that she gets dizzy from Lisinopril [ACE inhibitor used to treat blood pressure], she also thinks anxiety brings her blood pressure up.  Asked for muscle relaxer (Flexeril) for back pain.  Plaintiff reported she was starting a job as an assistant manager/sales clerk.  Dr. Green assessed hypertension "better on Toprol", anxiety for which he prescribed Xanax, and low back pain for which he prescribed Flexeril.

On October 9, 2003, plaintiff was seen at Ozark Medical Center for a medication follow up (Tr. at 310).  Plaintiff reported she feels "5/10", "will feel

32

better when more independent & more money".  Plaintiff was noted to have good eye contact.  She was diagnosed with major depressive disorder, anxiety, alcohol/cocaine dependence, history of seizures, hypertension, degenerative disc disease, status post discharge from prison.  She was told to continue her medication and return in three months.

On October 30, 2003, plaintiff went to the McCune-Brooks Hospital Emergency Room (Tr. at 367-371).  Plaintiff stated she fell off a ladder last week and had been having low back pain for the past three days.  ER personnel x-rayed plaintiff's lumbar spine and found "1.  Mild superior end plate compression deformity of L2 which appears old.  2.  Degenerative arthritis of the lumbar spine, most marked L5-S1." Prescribed Ultracet [used for short-term management of pain] and Flexeril [muscle relaxer].

On November 4, 2003, plaintiff went to Dr. Green's office (Tr. at 337).  He noted plaintiff smokes 1/2 pack of cigarettes per day.  "Has disability papers to fill out."

On November 7, 2003, Robert Whitten, Ph.D., completed a Medical Source Statement - Mental (Tr. at 306-307).  Dr. Whitten found that plaintiff was not significantly limited in the following abilities:

- ▪ The ability to remember locations and work-like procedures

- ▪ The ability to carry out very short and simple instructions

- ▪ The ability to sustain an ordinary routine without special supervision

- The ability to make simple work-related decisions

- The ability to ask simple questions or request assistance

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

He found that plaintiff was moderately limited in the following:

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

He found that plaintiff was markedly limited in the following:

- The ability to understand and remember very short and simple instructions

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to interact appropriately with the general public

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to respond appropriately to changes in the work setting

He found plaintiff extremely limited in the following:

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

On November 14, 2003, Mark Farnham, M.D., took a chest x-ray (Tr. at 335). Impression: "Stable chest radiograph with the exception of some fibrotic scar[10] or atelectasis[11] at the lateral base."

That same day, Dr. Green completed a Medical Source Statement - Physical (Tr. at 302-303). Dr. Green found that plaintiff could lift and carry 20 pounds frequently and 25 pounds occasionally, that she could stand or walk for 15 minutes at a time and for less than an hour per eight-hour day, that she could sit for 15 minutes at a time and for less than one hour per eight-hour day, and that she could not push or pull large or heavy objects. He found that plaintiff could never stoop and could only occasionally climb, balance, kneel, crouch, crawl, reach, handle, finger, feel, or use near acuity vision. Plaintiff could never use far acuity vision. He found that plaintiff should avoid any exposure to extreme cold, extreme heat, weather, dust, fumes, vibration, hazards, or heights, and that she should avoid moderate exposure to wetness and humidity. The form asks, "If patient suffers pain, is there a need to lie down or recline to

---

[10]Formation of fibrous scar tissue formed as a reparative process.

[11]Decreased or absent air in the entire part of a lung with resulting loss of lung volume.

alleviate symptoms during an 8 hour work day?  If so how often?  Duration?"  Dr.

Green checked "yes" and wrote that plaintiff needed to lie down or recline two

times per work day for ten to 15 minutes at a time.  He also wrote that plaintiff

experiences drowsiness from her medication.

Plaintiff saw Dr. Green on December 10, 2003, for head congestion (Tr. at

334).   "Still smokes but claims to have cut down.  Takes care of baby."

Diagnosed eustachian tube dysfunction, anxiety, and osteoarthritis "pain

controlled with Vicodin".

On January 12, 2004, Geoffrey Day, M.D., performed a gallbladder

ultrasound (Tr. at 330-331).  Impression:  "Upper limits of normal to minimally

dilated common bile duct measuring 6.2 mm in maximum diameter.  This may or

may not be of clinical or pathologic significance but could potentially be related to

cholestasis[12] versus partial distal common bile duct obstruction but without

evidence for pancreatic mass.  Follow up nuclear hepatobiliary imaging versus

ERCP cholangiogram[13] may be of benefit for further evaluation if clinically

indicated.

---

[12]An arrest in the flow of bile.

[13]A procedure done to diagnose and treat problems in the liver, gallbladder,
bile ducts, and pancreas.  ERCP combines the use of x-rays and an endoscope
(a long, flexible, lighted tube). Through it, the physician can see the inside of the
stomach and duodenum and inject dye into the bile ducts and pancreas so they
can be seen on x-ray.

On February 9, 2004, plaintiff had a follow up with Dr. Green (Tr. at 328). Still has low back pain, still anxious. Social History: husband back in town from Wichita. Diagnosed Dysphagia [difficulty swallowing], GERD [gastroesophageal reflux disease], hypertension (improved).

On February 12, 2004, Dr. Day performed a Nuclear Hepatobiliary scan with gallbladder ejection fraction (Tr. at 327). "Impression: 1. Reproduction of patient's symptoms . . . is of unknown clinical or pathologic significance, particularly given normal gallbladder ejection fraction of 83%. 2. No additional significant nuclear hepatobiliary abnormality."

On February 26, 2004, plaintiff was seen at Ozark Medical Center (Tr. at 309). "Pt [patient] feels doing well." Most of the record is illegible. Diagnosed major depressive disorder, anxiety, alcohol/cocaine dependence, history of seizures/hypertension/degenerative joint disease; status post discharge from prison.

On March 6, 2004, plaintiff was seen by Dr. Green (Tr. at 326). In social history, Dr. Green noted that plaintiff was going on a trip to Tennessee. "We talked about cutting down P.O.[14] narcotics. She will have to try pain patches and decrease narcotic use."

_____

[14]"P.O." can mean "post-operative" or "oral" narcotics. I am not exactly sure what Dr. Green meant, but it is clear he was referring to narcotic pain medication.

On April 15, 2004, plaintiff saw Dr. Green who noted that plaintiff needed pain patches (Tr. at 325). Has letter of refusal denying patches by Medicaid. Still has back pain chronically. She used one month of patches and had good result. Diagnosed back pain and hypertension controlled on medication.

Plaintiff returned to see Dr. Green on May 9, 2004, for back pain patch (Tr. at 324). Plaintiff reported that she had seen pain specialists and back specialists in the past. She continued to have back pain. Dr. Green diagnosed back pain, noted he would check her x-rays, and diagnosed hypertension - stable.

On June 4, 2004, plaintiff saw John Williams, M.D., who performed an MRI of plaintiff's lumbar spine (Tr. at 319, 321). "There is chronic deformity of L2 consistent with an old healed fracture. There is advanced degenerative disc disease at the L5-S1 level. This produces secondary degenerative changes in the end plates of L5 and S1. . . . There is diffuse disc bulging at L5-S1 with small central disc protrusion. This produces mild central spinal stenosis. Also there is moderate bilateral foraminal stenosis at L5-S1 due to degenerative changes and disc bulging.

Impression:

1.      Diffuse lumbar spondylosis and degenerative disc disease, most notable at L5-S1. Note associated moderate bilateral L5-S1 foraminal stenosis.

38

2.      Diffuse disc bulging at L5-S1 with small central disc protrusion. This produces mild central spinal stenosis.

3.      Chronic deformity of L2 representing old healed L2 fracture."

Dr. Williams also took x-rays of plaintiff's lumbar spine.  "[M]ildly prominent lumbar lordotic curvature. . . .  There is chronic deformity of the L2 vertebral body consistent with old healed fracture.  There is narrowing of the L5-S1 disc space consistent with disc degeneration.  The mid and lower facets are also degenerative.  Oblique views suggest bilateral L5 spondylolysis. . . .

Impression:

1.      Chronic deformity of L2 suggesting old, healed fracture.

2.      Mid and lower lumbar spondylosis[15] and degenerative disc disease. Findings predominate at L5-S1.

3.      Bilateral L5 spondylolysis.  No spondylolisthesis[16] is evident."

On June 4, 2004, Paul Jones, M.D., conducted a bone densitometry study (Tr. at 320).  Impression:  grossly normal bone densitometry study obtained of the lumbar spine and left hip.

On June 14, 2004, plaintiff was seen at the McCune-Brooks Hospital Emergency Room complaining of back spasm (Tr. at 357-360).  The treating doctor prescribed a medication for nausea.

---

[15]Stiffening of a vertebra as the result of a disease process.

[16]Forward movement of the body of a lower lumbar vertebra on the vertebra below it.

## C.     SUMMARY OF TESTIMONY

During the August 12, 2004, hearing, plaintiff testified; and Lisa Keen, a vocational expert, testified at the request of the ALJ.

### 1.     Plaintiff's testimony.

Plaintiff testified that at the time of the hearing she was 45 years of age (Tr. at 381).  Plaintiff attended school through the eighth grade (Tr. at 381). Plaintiff is able to read and write, and she was scheduled to take her G.E.D. exam the month after the hearing (Tr. at 381-382).  The state requires all incarcerated individuals to study for and attempt to get a G.E.D., so plaintiff had been studying for her exam (Tr. at 382).

Plaintiff is 5' 1" tall and weighs about 136 pounds (Tr. at 382).  Plaintiff and her husband are separated (Tr. at 382).  She has two children, ages 31 and 25 (Tr. at 382). Plaintiff lives alone in a house (Tr. at 383).  Plaintiff has no income except food stamps (Tr. at 383).  She last worked in the 1980's, but in October 2003 she worked for 28 days at the Dollar Tree Store before she was let go (Tr. at 383).  Plaintiff worked four hours per day as a cashier and she put boxes on shelves (Tr. at 384).  She was unable to carry the boxes, climb up and down the ladders, or remember how to work the cash register  (Tr. at 384).  Plaintiff did not have any panic attacks while working at the Dollar Tree Store, but she felt overwhelmed because she did not know what she was doing (Tr. at 405).

Case 3:05-cv-05002-REL   Document 18   Filed 10/11/05   Page 40 of 68

Plaintiff suffers from grand mal seizures but she testified that her seizures are controlled with medication (Tr. at 384). Her worst problem is her back (Tr. at 384). Plaintiff testified that she has degenerative disc disease, back disease, osteoporosis, nerve damage, a herniated disc, arthritis, and several fractures in her back (Tr. at 385, 386). Plaintiff used a Duragesic patch which "worked very well" but she was allergic to it and is now on OxyContin (Tr. at 385). Plaintiff said she loses control of her bowels from the nerve damage (Tr. at 385-386). This happens two or three times per week (Tr. at 396). Afterward she needs to change her clothes (Tr. at 396). Plaintiff has had two injections in her back – the first one helped but something went wrong the second time and she went numb from the waste down and could not walk (Tr. at 386). The doctor does not know whether he wants to do another one because of her reaction (Tr. at 386). Moist-heat towels and pain mediation help plaintiff's back pain (Tr. at 386).

Plaintiff has had seizures her entire life (Tr. at 387). She takes Dilantin for the seizures (Tr. at 387). Plaintiff had two seizures the week before the hearing, but had not had a seizure before that for the past six months (Tr. at 387). After she has a seizure, she goes to sleep and is useless for the rest of the day (Tr. at 388). She is very foggy-headed for the next 12 hours after a seizure (Tr. at 388).

Plaintiff experiences mental problems – for example, her husband is an alcoholic who came in from Wichita the week before the hearing (Tr. at 389). He started breaking things and she got upset and that caused her seizures (Tr. at

389).  Plaintiff takes Zoloft prescribed by her family doctor, Dr. Green (Tr. at 389).

Plaintiff has problems with her memory (Tr. at 397).  For example, her children

will say they are going to come by to pick her up and she forgets, or she forgets

to take her medicine and then does not know whether she took it or not (Tr. at

397).  She has to re-read and re-read recipes while she's cooking, and she has

to read things several times before she understands what it means (Tr. at 398).

Plaintiff had a panic attack when she got out of prison and was around people

(Tr. at 399).  She sometimes goes to the grocery store, but sometimes her

daughter shops for her (Tr. at 399-400).  Plaintiff goes to church about twice a

month (Tr. at 400).  When asked if she has any difficulty doing that, she stated

that she worries about her bowel problem (Tr. at 400).

Plaintiff has not been to counseling because her kids both work and they

cannot take off work to take her to counseling (Tr. at 400-401).  Plaintiff cannot

drive because her license has been suspended due to her DWI convictions (Tr.

at 401).

On a typical day, plaintiff cleans her house, cooks, bakes (Tr. at 390).

She cannot vacuum because she is unable to pull or pick up the vacuum (Tr. at

390).  Plaintiff does her dishes by hand, and does not have to stop and rest (Tr.

at 391).  She stands when she cooks, she is able to peel and chop vegetables,

and she is able to squat down to get her pans out (Tr. at 391).  Plaintiff drops

small things, like change, because of arthritis in her hands (Tr. at 392).  Plaintiff

does not keep things in her tall cabinets because she cannot go up a ladder (Tr. at 392). She can reach over her head with no difficulty (Tr. at 392). Plaintiff normally can take care of herself, but if her back is really bad, her daughter will come in and help her get dressed (Tr. at 393). Plaintiff has no difficulty walking (Tr. at 394). She thinks she could walk two or three blocks (Tr. at 395). Plaintiff can only stand for about 20 minutes at a time (Tr. at 395). Plaintiff can only sit for ten minutes at a time because of her back pain (Tr. at 395). Then she has to get up and move (Tr. at 395). Plaintiff can lift about 15 pounds (Tr. at 395).

On a typical day, plaintiff will lie down or recline 18 times during the day (Tr. at 398). In an eight-hour work day, plaintiff estimated she would be lying down or reclining the entire eight hours (Tr. at 398-399).

Plaintiff smokes a pack of cigarettes per day (Tr. at 393). She has been smoking for about 20 years (Tr. at 393). In the 1980's plaintiff used cocaine (Tr. at 393). She was arrested for her third DWI (Tr. at 393-394). She started to say that she does not have an alcohol problem, but then she admitted she did have a problem because she was arrested and went to prison for it (Tr. at 393-394). She was in prison for 14 months (Tr. at 394). Plaintiff underwent treatment in prison and stopped drinking (Tr. at 394). She stopped using cocaine years ago (Tr. at 394).

Case 3:05-cv-05002-REL   Document 18   Filed 10/11/05   Page 43 of 68

### 2. Vocational expert testimony.

Vocational expert Lisa Keen testified at the request of the Administrative Law Judge. The first hypothetical was the following: The person can lift 20 pounds occasionally and ten pounds frequently; can stand and walk for six or more hours in a day; can sit without limit; can occasionally bend, stoop, twist, squat, and kneel; cannot climb or crawl; cannot work at heights or around hazardous moving machinery; should have restricted contact with the public and coworkers; can work in the presence of others but should not be part of a cooperative work process or a work team (Tr. at 402).

The vocational expert testified that such a person could work as a bench assembler, a pressing machine operator, or a microfilm mounter (Tr. at 402). There are 20,000 bench assemblers in the state, and that is a light unskilled job (Tr. at 402). There are 1,406 pressing machine operator jobs in the state, and 300 micro film mounter jobs in the state (Tr. at 402). Those are also light unskilled jobs (Tr. at 402).

The second hypothetical assumed the following: The person could lift ten pounds occasionally and small objects throughout the workday; could stand or walk for 30 minutes at a time and for a total of two hours per day; could sit without limitation during the day; could occasionally bend, stoop, twist, squat, and kneel; cannot climb or crawl; cannot work at heights or around hazardous moving machinery; should have restricted contact with the public and coworkers; could

44

work in the presence of others but should not be part of a cooperative work process or a work team (Tr. at 402-403).

The vocational expert testified that such a person could be a wire patcher, photo finisher, or optical goods assembler (Tr. at 403). There are 7,500 wire patchers in the state, 570 photo finishers in the state, and 260 optical bench assemblers in the state (Tr. at 403).

The third hypothetical was as following: The person could lift and carry 20 pounds frequently and 25 pounds occasionally; could stand or walk for 15 minutes at a time and for less than one hour per day; could sit for 15 minutes at a time and for less than one hour per day; could not push or pull heavy objects; could occasionally climb, balance, kneel, crouch, crawl, reach, handle, finger, and feel; can never stoop; must avoid any exposure to extreme heat or cold or weather, dust, fumes, vibrations, hazards, and heights; can have only moderate exposure to wetness and humidity; and takes medication which makes her drowsy and must lie down for pain relief two times a day for ten to 15 minutes at a time (Tr. at 404). This hypothetical came from the Medical Source Statement of Dr. Green, and plaintiff's attorney acknowledged that it was internally inconsistent (Tr. at 404).

The vocational expert testified that a person with those limitations could not work (Tr. at 404).

The ALJ then clarified that none of the jobs the vocational expert testified that the first two hypothetical persons could perform required pushing or pulling large or heavy objects, more than moderate exposure to wetness or humidity, or distant visual acuity (Tr. at 404-405).

The final hypothetical was as follows: The person has the same physical limitations as the person in hypothetical one but also has the mental limitations found in the Medical Source Statement - Mental of Dr. Whitten (Tr. at 405). The vocational expert testified that a person with those mental limitations could not work (Tr. at 406).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge William C. Thompson, Jr., issued his opinion on October 20, 2004 (Tr. at 12-22).

Step one. The ALJ found that plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 13).

Step two. The ALJ found that plaintiff suffers from convulsive epilepsy and anxiety, impairments that are severe (Tr. at 14).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 14).

Step four. The ALJ determined that plaintiff's anxiety causes her to experience moderate limitations in maintaining concentration, persistence or pace; she experiences mild restrictions in her activities of daily living or

46

maintaining social functioning; she has never experienced an episode of decompensation of extended duration; and she retains the sustained concentration and persistence necessary to engage in substantial gainful activity at an unskilled level (Tr. at 18).

The ALJ determined that plaintiff retains the residual functional capacity to lift 20 pounds occasionally and ten pounds frequently; stand or walk for six or more hours per day; has no sitting limitation; can occasionally bend, stoop, twist, squat, or kneel; should not crawl or climb ladders or scaffolding; should not work at heights or around hazardous machinery; should work with relatively restricted contact with coworkers and the public; and can work in the presence of others but should not be part of a cooperative work process or on a work team (Tr. at 18).

Because plaintiff has no work history, she cannot return to her past relevant work (Tr. at 18).

Step five.  The ALJ found that plaintiff can perform the following light unskilled jobs:  bench assembler with 20,000 positions in the state, press machine operator with 1,400 positions in the state, and microfilm mounter with 300 positions in the state (Tr. at 20).  Plaintiff can also perform the following sedentary unskilled jobs, when using the ALJ's alternative residual function capacity:  wire patcher with 7,500 jobs in the state, photo finisher with 570

47

positions in the state, and optical goods assembly with 260 positions in the state (Tr. at 20).

## VI.    CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

### A.    CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints.  Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions.  Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence.  Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal

48

observations by the ALJ.  In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions.   Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion.

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> I find that, in light of the discrepancy between the claimant's assertions and information contained in the physicians' reports, the allegations by the claimant as to the intensity, persistence, and limiting effects of her symptoms are not well supported by probative evidence and are not totally credible.  The claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations.  She is able to perform light house cleaning, prepare meals and receives help with heavier items.  She is able to attend church and helped move to a new location.  Furthermore the fact that the claimant was involved in moving and attempted to return to work indicate that the claimant's daily activities have, at least at times, been somewhat greater than the claimant has generally reported.  Additionally the claimant herself has admitted that her anxiety may be due to her adjustment to normal living after her incarceration for DWI.  Despite the allegations of symptoms and limitations preventing all work, the claimant also indicated that she was going on a trip to Tennessee on March 16, 2004.  Although vacations and disability are not necessarily mutually exclusive, the claimant's decision to go on an interstate vacation tends to further suggest that the alleged symptoms and limitations may have been overstated.

(Tr. at 15).

49

### 1.   PRIOR WORK RECORD

Plaintiff has no significant work history.  The most she ever earned in a year was $1,021.38 in 1978.  During seven different years she earned less than $100, and during 16 years she earned no income.

### 2.   DAILY ACTIVITIES

The ALJ relied heavily of plaintiff's daily activities in finding that she exaggerated her lack of ability.  The record supports that finding.

In June 2003, plaintiff was working in a housing unit while incarcerated.  In August 2003, plaintiff told her doctor, shortly after having a hysterectomy, that she had been climbing stairs.  On September 9, 2003, plaintiff said she had been on a stool cleaning cabinets.  In September 2003 she overdid it moving and pulled some stitches.  That same month, she told a counselor with Disability Determinations that she can do her activities of daily living without problems and she interacts with others without difficulty.  In October 2003, plaintiff was on a ladder.  In December 2003 she noted that she was taking care of a baby.  In March 2004 she planned to go on a trip to Tennessee.

Plaintiff testified that she lives alone in a house.  She cleans her house, cooks, bakes, does her dishes by hand without having to stop and rest.  She stands when she cooks and she is able to stand while she peels and chops vegetables.  She can squat down to get pans out of cabinets.  She can reach overhead without difficulty.  She said she normally can take care of herself, she

has no difficulty walking, and she attends church services about twice a month.

Plaintiff's sitting through church services and sitting while traveling to Tennessee contradict her testimony that she can only sit for only ten minutes at a time. Her moving, climbing ladders, cleaning cabinets, taking care of a baby, and taking care of herself are inconsistent with her allegations of disability. This factor supports the ALJ's credibility determination.

### 3.    *DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS*

In September 2003, plaintiff told a Disability Determinations counselor that she interacts with others without difficulty and she does not feel like she has limitations due to anxiety. During the hearing, she testified that she had not had any seizures for six months until the week before the hearing. There is really no other evidence on this factor.

### 4.    *PRECIPITATING AND AGGRAVATING FACTORS*

In August 2002, plaintiff told a nurse that her discomfort increases with movement or position change. However, during the hearing she testified that she can only sit for ten minutes and then has to get up and move.

Plaintiff told a Disability Determinations counselor in September 2003 that she thought her anxiety was from adjusting to normal living after being incarcerated.

Case 3:05-cv-05002-REL   Document 18   Filed 10/11/05   Page 51 of 68

She testified that she did not have any panic attacks while working at the Dollar Tree Store. She goes to church twice a month without no anxiety and no trouble sitting. There are no other precipitating or aggravating factors.

## 5. DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION

The record indicates that plaintiff has had good results with her medication overall. In August 2002, plaintiff told Dr. Reddy she was doing OK and denied any problems with her medication. In April 2003, plaintiff said Doxepin helped calm her down and Prozac was helping to stabilize her mood. In June 2003, plaintiff said that Prozac and Doxepin had helped her depression. The end of June 2003, plaintiff said she was doing well with her psychiatric medication. In July 2003, plaintiff was on her medication and had no complaints. In September 2003, plaintiff told a Disability Determinations counselor that her last seizure was before she was released from prison, probably May 2003. She said she was on Dilantin and had done fine with that since her release. In December 2003, Dr. Green noted that plaintiff's pain was controlled with Vicodin. In February 2004, plaintiff told a doctor at Ozark Medical Center that she was doing well. In April 2004, Dr. Green noted that after one month on pain patches, plaintiff had a good result. He noted her back pain was controlled on medication. Plaintiff testified at the hearing that her seizures are controlled with medication. She also testified that moist-heat towels and pain medication help her back pain.

The record indicates that plaintiff was prescribed very conservative treatment for her pain. In September 2002, plaintiff was prescribed Ibuprofen for pain. In November 2002, she was given permission to have a single Motrin for back pain, but she left the medical unit without taking it. In December 2002, plaintiff was given Ibuprofen for her back pain. In December 2002, Dr. Cochran recommended using ice for shoulder pain. In January 2003, Dr. Kulkanthorn prescribed a non-steroidal anti-inflammatory for shoulder pain. In January 2003, Dr. Hampton recommended Benadryl, an antihistamine, for 24 hours. In March 2003, plaintiff was given Tylenol for neck pain. In May 2003, plaintiff was given hydrocortisone cream for a rash she claimed was caused by Prozac. In June 2003, plaintiff was given Tylenol for back pain. In September 2003 Dr. Green prescribed a non-steroidal anti-inflammatory, the use of ice, and physical therapy for plaintiff's back pain. In October 2003, plaintiff was given a muscle relaxer for her back pain.

Plaintiff has had relatively minor side effects from her medication. In October 2002, plaintiff denied any side effects from her medications. In January 2003, she reported side effects of dry mouth, lethargy after lunch, more irritable mood, and a 15-pound weight gain. In January 23, 2003, plaintiff experienced swelling in her hands which she attributed to her medication. In February 2003, plaintiff was asked about side effects of medication and plaintiff reported no

Case 3:05-cv-05002-REL   Document 18   Filed 10/11/05   Page 53 of 68

drowsiness, no easy bruising, no skin discoloration, no oral sores, no fatigue, no

dizziness, and no confusion.

This factor supports the ALJ's credibility decision.

### 6.    *FUNCTIONAL RESTRICTIONS*

Plaintiff was not placed on any functional restrictions other than briefly

after having undergone a hysterectomy.  In fact, her doctors have consistently

recommended exercise rather than restricting her activities.  In August 2002, Dr.

Rakestraw recommended exercise.  In November 2002, Dr. San-Gil

recommended that plaintiff exercise. In February 2003, Dr. Cabrera

recommended plaintiff exercise.  Later in February 2003, Nurse Sara White

recommended that plaintiff exercise.  In June 2003, Dr. Cabrera recommended

exercises.  These recommendations are inconsistent with plaintiff's testimony

that she needs to lie down or recline 18 times during the day.

In September 2003, Dr. Bland found that plaintiff has no restriction of

activities of daily living; no difficulties in maintaining social functioning; mild

difficulties in maintaining concentration, persistence, or pace; and has had no

repeated episodes of decompensation.

The record establishes that plaintiff had virtually no functional restrictions,

which coincides with her reported activities of daily living. This factor supports the

ALJ's credibility determination.

### B.    CREDIBILITY CONCLUSION

In addition to the above factors, I find that the record establishes other instances of contradictions made by plaintiff, instances of plaintiff refusing medical treatment, and the medical records establish that her conditions were much milder than she reports.

For example, plaintiff requested that Dr. Barbee prescribe Premarin, but Dr. Barbee noted that in the past plaintiff had listed Premarin as an allergy. In July 2002, plaintiff told a mental health technician that she had cut her wrists, overdosed, and tried to commit suicide twice in the past. Yet, one month later plaintiff saw Dr. Reddy and denied any past suicide attempts. In October 2002, plaintiff told Nurse Marilyn Meyer that she had had a seizure the night before, yet she refused both of her seizure medications and no one noted any seizure activity. In November 2002, plaintiff refused to take her seizure control medication. Later that month, she was authorized a Motrin after claiming arm pain that she believed was a stroke, but she refused to take the Motrin. In December 2002, Dr. Taylor noted that plaintiff presented a very conflicting history -- she said she was taken off Dilantin due to an inability to get adequate blood level while on the generic form, but the lab report was normal and another doctor's note indicated that plaintiff could not tolerate the Dilantin which plaintiff denied. In December 2002, plaintiff refused to take her Vistaril, used to treat anxiety, for at least two weeks. In January 2003, she refused to take her Elavil

for four days.  In April 2003, plaintiff said she got hot and passed out but did not

have a seizure. A bit later, she said she indeed had had a seizure, but the nurse

noted that plaintiff was not postictal.  In May 2003, plaintiff stopped taking her

Prozac for several days.  In September 2003, she told Dr. Whitten she had been

prescribed Remeron for depression, but she never filled the prescription because

she did not want to take pills.  In September 2003, she said she stopped using

cocaine two years earlier; however, she told Dr. Whitten she had not used

cocaine in 20 years.  Plaintiff testified that she has nerve damage which causes

her to lose control of her bowels, resulting in a need to change her clothes, and

that this happens two to three times per week.  Yet, this nerve damage or lack of

bowel control is not mentioned in any medical record.  Plaintiff testified that she

had two injections in her back, but something went wrong the second time and

she was unable to walk. There is no mention of this in any of the medical

records.  Finally, she was advised repeatedly by all of her doctors to stop

smoking, yet she continues to smoke.

The medical records indicate that plaintiff's impairments are not nearly as

severe as she claims.  In August 2002, her range of motion was within

acceptable limits.  In September 2003, her shoulder x-rays were normal.  In

November 2002, she had full range of motion in her back and shoulders.  The

following week, she complained of shoulder pain, but she had good range of

motion in her shoulder.  On November 19, 2002, plaintiff complained of having a

stroke. She had full range of motion in her arm, and her EKG was normal. The following day Dr. San-Gil noted that objective measures did not validate plaintiff's catastrophic claims of heart attack and stroke. Plaintiff claimed x-rays showed her shoulder was broken, but she was shown her normal x-rays. A couple of days later, more x-rays were taken and they were normal. In December 2002, more x-rays were taken and they were also normal. In January 2003, plaintiff claimed to be having a seizure, but her vital signs were all normal. In April 2003 after plaintiff said she had a seizure, the nurse could not give her the medication to stop the seizure because plaintiff had gone to her room to eat. In June 2003, plaintiff had normal gait, normal muscle strength, normal tendon reflex, normal perianal sensation, normal posture, normal range of motion, no muscle spasms, no point tenderness in her spine, and normal straight leg raising. In July 2003, her chest x-rays were normal. In August 2003, plaintiff had good range of motion in her extremities and no edema. Later that month, she was noted to have good range of motion in her extremities and no edema. In May 2004, plaintiff's hypertension was noted to be stable.

Based on all of the above, I find that the substantial evidence in the record supports the ALJ's decision to discredit plaintiff's subjective complaints of disability. Therefore, plaintiff's motion for summary judgment on this basis will be denied.

### VII.    WEIGHT GIVEN TO DRS. GREEN AND WHITTEN

Plaintiff argues that the ALJ erred in discrediting the opinion of Dr. Jeffrey Green, a treating physician, in his Medical Source Statement - Physical and the opinion of a consulting psychologist, Dr. Robert Whitten, in his Medical Source Statement - Mental.

### A.    DR. GREEN

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques.  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005).  If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give to the opinion of the treating physician:  (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor.  20 C.F.R. § 404.1527(d)(2) - (5).

The opinion at issue, Dr. Green's Medical Source Statement - Physical, lists the following opinion of plaintiff's abilities:

- lift and carry 20 pounds frequently and 25 pounds occasionally

- stand or walk for 15 minutes at a time and for less than an hour per eight-hour day

- sit for 15 minutes at a time and for less than one hour per eight-hour day

- not push or pull large or heavy objects

- never stoop

- occasionally climb, balance, kneel, crouch, crawl, reach, handle, finger, feel, or use near acuity vision

- never use far acuity vision

- avoid any exposure to extreme cold, extreme heat, weather, dust, fumes, vibration, hazards, or heights

- avoid moderate exposure to wetness and humidity

- needs to lie down or recline two times per work day for ten to 15 minutes at a time

- experiences drowsiness from her medication

The ALJ found that plaintiff's lifting restrictions were even greater than those posed by Dr. Green, so the lifting factor is not relevant to this discussion. The only abilities that are relevant to the hypotheticals posed to the vocational expert and relied upon by the ALJ are the abilities to sit, stand, walk, and stoop.

Stoop. I will begin with the ability to stoop. To stoop means to bend forward and down from the waist or the middle of the back. According to the Dictionary of Occupational Titles, the bench assembler position which the ALJ found plaintiff could perform requires occasional stooping. However, the press

Case 3:05-cv-05002-REL   Document 18   Filed 10/11/05   Page 59 of 68

machine operator[17] position requires no stooping, and the microfilm mounter[18] position requires no stooping. Because these two positions, which the ALJ found plaintiff could perform, require no stooping, Dr. Green's opinion with regard to stooping is irrelevant.

I also point out that Dr. Green's records provide no evidence that plaintiff ever complained of an inability to stoop, Dr. Green never advised plaintiff not to stoop, his Medical Source Statement - Physical is internally inconsistent (as discussed more below), and his records show no testing to support any of his diagnoses. For these reasons, I find that the substantial record as a whole supports the ALJ's decision to discredit Dr. Green's opinion.

Stand or walk. Dr. Green found that plaintiff could stand or walk only 15 minutes at a time and for a total of less than an hour per eight-hour day. The ALJ found that plaintiff could stand or walk for six or more hours per day. In his alternate holding, the ALJ found that plaintiff could still do other work even if he were to find that plaintiff could stand or walk for only 30 minutes at a time and for a total of only two hours per work day.

Dr. Green's opinion must be granted controlling weight if the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques.

---

[17]D.O.T. 363.682-018.

[18]D.O.T. 208.685-022.

I find that the record establishes that Dr. Green's opinion is not supported by medically acceptable clinical and laboratory diagnostic techniques, it is not supported by any of his own medical records, and it is inconsistent with the other substantial evidence in the record.

Dr. Green's records show that he performed no tests prior to forming the opinion at issue. He saw plaintiff only a handful of times before completing the Medical Source Statement - Physical. During those visits, he diagnosed arthritis in the low back and gave plaintiff samples of Vioxx. The following month he assessed low back pain, prescribed a non-steroidal anti-inflammatory, and recommended plaintiff use an ice pack and begin physical therapy (there are no physical therapy records in this file). The next month, plaintiff asked for a muscle relaxer for her back pain and stated that she was starting a job as an assistant manager/sales clerk. Dr. Green did not advise plaintiff against starting that job because of an inability to stand or walk. Dr. Green assessed low back pain and prescribed Flexeril, a muscle relaxer. The next month, Dr. Green noted that plaintiff was still smoking and that she brought disability papers for him to fill out. He completed the Medical Source Statement - Physical about a week later.

There is nothing in these records even suggesting that plaintiff has difficulty with standing or walking. There is no recommendation by Dr. Green that plaintiff limit her standing or walking in any way. There is no prescription for strong pain medication and there are no functional limitations imposed at all. Dr.

61

Green's assessment of plaintiff's back pain or back arthritis come solely from her subjective complaints of pain and are treated conservatively.

I also note that Dr. Green's opinion in the Medical Source Statement is that plaintiff can stand or walk for less than an hour per day, that she can sit for less than one hour per day, and that she needs to lie down or recline two times per day for ten to 15 minutes at a time. Out of an eight-hour work day, this amounts to a total of less than 2.5 hours of sitting, standing, walking, reclining, and lying down. As plaintiff's attorney acknowledged during the hearing, this opinion is internally inconsistent -- there is nothing left for plaintiff to do during the remaining 5.5 hours per workday besides float.

Plaintiff testified that she worked at the Dollar Tree Store in October 2003 -- during the time she was being treated by Dr. Green. She testified that she lost that job because she was unable to carry the boxes, climb up the ladders, or remember how to work the cash register. She did not testify that she had any difficulty with the walking or standing at that job. Plaintiff testified that on a typical day, she cleans her house, cooks, bakes, does her dishes by hand without having to stop and rest, she stands when she cooks and is able to peel and chop vegetables. She testified that she has no difficulty walking (Tr. at 394). She testified that she could stand for 20 minutes at a time, which is even greater than that found by Dr. Green.

62

There is nothing in any medical record of Dr. Green or any other doctor in which plaintiff complained of difficulty walking or standing. No other doctor recommended that plaintiff limit her walking or standing. On August 1, 2003, plaintiff met face-to-face with Carol Maddy who observed that plaintiff had no difficulty walking or standing. There simply is nothing in the record to support Dr. Green's Medical Source Statement - Physical with regard to plaintiff's ability to walk or stand.

The substantial evidence in the record as a whole supports the ALJ's decision to discredit Dr. Green's opinion on plaintiff's ability to stand or walk.

Sit. Dr. Green found that plaintiff could sit for only 15 minutes at a time and for less than one hour per day. The ALJ found that plaintiff has no sitting limitation.

Dr. Green's records show that he performed no tests prior to forming the opinion at issue. As mentioned above, Dr. Green saw plaintiff only a handful of times before completing the Medical Source Statement - Physical, he diagnosed back pain from nothing more than plaintiff's subjective complaints, and he prescribed conservative treatment. There is nothing in Dr. Green's records suggesting that plaintiff has difficulty with sitting, there is no recommendation by Dr. Green that plaintiff limit her sitting in any way. There is no prescription for strong pain medication and there are no functional limitations imposed.

63

Plaintiff testified that she attends church services twice a month, and the only problem she has is worrying about her "bowel problem." She did not indicate she has any trouble sitting through the services. There is nothing in any medical record of Dr. Green or any other doctor in which plaintiff complained of difficulty sitting. No other doctor recommended that plaintiff limit her sitting. On August 1, 2003, plaintiff met face-to-face with Carol Maddy who observed that plaintiff had no difficulty sitting. There simply is nothing in the record to support Dr. Green's Medical Source Statement - Physical with regard to plaintiff's ability to sit.

The substantial evidence in the record as a whole supports the ALJ's decision to discredit Dr. Green's opinion on plaintiff's ability to sit.

Based on all of the above, I find that the ALJ properly discredited the opinion of Dr. Green. Therefore, plaintiff's motion for summary judgment on this basis will be denied.

**B.    DR. WHITTEN**

During the administrative hearing, the vocational expert testified that a person with the mental limitations set out by Dr. Whitten in his Medical Source Statement - Mental could perform no work. Dr. Whitten completed the Medical Source Statement on November 7, 2003. Dr. Whitten actually examined plaintiff one time, on September 23, 2003, after the Division of Family Services referred plaintiff to Dr. Whitten as a consulting doctor.

64

During the September 23, 2003, visit, Dr. Whitten noted that plaintiff left before he finished all the testing he wanted to give to explore plaintiff's memory, neurological status, and learning ability. He also noted that plaintiff's effort on the testing she did complete was "significantly diminished . . . so that the actual test scores likely do underestimate her potential". Finally, he noted that plaintiff's conversational ability led him to expect her to possess average verbal skills, yet she scored much lower than he expected on the tests to which she applied significantly diminished effort.

All of this seems to lead to the conclusion that Dr. Whitten's tests are not reliable indicators of plaintiff's mental abilities. However, he concludes that plaintiff has markedly limited mental abilities.

Dr. Whitten also "assumes" that plaintiff's memory, concentration, expressive language function, stability of mood control, and inhibition of anger are all "damaged" due to her history of multiple head injuries, comas, and strokes. All of this information came from plaintiff, and from no other source. Plaintiff told Dr. Whitten that she suffered two strokes, the last of which occurred while she was in prison. However, the very extensive prison medical records reflect no stroke at all. In fact, plaintiff claimed she was having a stroke while she was in prison, but Dr. San-Gil noted that "[o]bjective measures do not validate her catastrophic claims of heart attack and stroke." Therefore, there is no medical basis whatsoever for Dr. Whitten's reliance on plaintiff's history of

65

multiple head injuries, comas, and strokes in his "assumption" that plaintiff must have damage to her memory, concentration, expressive language function, stability of mood control, and inhibition of anger.

Dr. Bland, Psy.D., found that plaintiff suffers from depression, but that her mental impairment is not severe. A doctor at the Ozark Medical Center in September 2003 found that plaintiff's GAF was 60, indicating moderate symptoms, and that her GAF over the last year had been 80, which means that if symptoms are present, they are transient and expectable reactions to psychosocial stressors.

Plaintiff was diagnosed with depression when she was seen by mental health professionals while in custody from July 2002 until July 2003. The Department of Corrections records indicate that on July 22, 2002, plaintiff claimed to have attempted suicide several times in the past, but on August 13, 2002, denied any previous suicide attempts. Plaintiff's brother was killed in a car accident and she was dealing with grief issues. In August 2002, plaintiff said she was OK, denied any problems with her medications, and her mood and affect were noted to be improving. In October 2002, plaintiff was diagnosed with depression and was prescribed Doxepin and Vistaril. Plaintiff stopped taking Vistaril on her own against her doctor's recommendation. In December, plaintiff was prescribed Elavil to replace the Vistaril. In January 2003, plaintiff's mood and affect were within normal limits. Later that month, plaintiff stopped taking the

Elavil. She was noted to have anxiety related to perceived loss of control regarding her treatment. On January 16, 2003, plaintiff's mood was stable. On February 7, 2003, plaintiff said that menopause was a factor in her emotional state. She said she did not want to take Elavil or Vistaril. By the following week, after having been on no medications, plaintiff was more emotional and felt down. She was put on Prozac, Fluoxetine, and Doxepin. There are no further emotional difficulties noted until April, a month after plaintiff thought she was going to be released from prison. She was upset and anxious because her release date was "taken away" from her. On April 28, 2003, plaintiff said the Doxepin helped calm her down. Prozac helped stabilize her mood. By May 4, 2003, plaintiff had stopped taking her Prozac, but she was put back on it. On June 24, 2003, plaintiff said that Prozac and Doxepin had helped her depression. On June 30, 2003, plaintiff said she was doing well on her psych medication.

In addition to that medical history at the Department of Corrections, plaintiff stated she had no mental health complaints on at least 31 different occasions during that year. She was, on those occasions, noted to have no crying, she was not withdrawn, she was not hostile, she was not angry, she was not manic, and she had no complaints.

Overall, the records indicate that when plaintiff took her medication as directed, she was fairly stable and her depression was controlled. These records are consistent with the findings of Dr. Bland and significantly contradict the

67

findings of Dr. Whitten.

Based on all of the above, I find that the substantial evidence in the record supports the ALJ's decision to discredit the opinion of consulting psychologist Dr. Whitten. Therefore, plaintiff's motion for summary judgment on this basis will be denied.

## VIII. CONCLUSIONS

I find that the substantial evidence in the record as a whole supports the ALJ's decision to discredit the opinion of Dr. Green, the opinion of Dr. Whitten, and the testimony of plaintiff. I further find that the evidence supports the ALJ's decision to find plaintiff not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
October 11, 2005

Case 3:05-cv-05002-REL   Document 18   Filed 10/11/05   Page 68 of 68